DELMER D. NORTON, APPELLEE, V. BANKERS FIRE INSURANCE COMPANY OF LINCOLN, APPELLANT.

FILED FEBRUARY 29, 1928. No. 26163.

*John C. Hartigan,* for appellant.

*C. C. Flansburg, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and HOWELL, JJ., and REDICK, District Judge.

ROSE, J.

This is an action to recover damages for the conversion of a note and mortgage for $10,200. The note was dated March 1, 1918. It bore annual interest from date at 7 per cent. and was secured by a first mortgage on 640 acres of land in Yuma county, Colorado. Both instruments were executed and delivered by Ralph O. Hesp and Earl Hesp, makers and mortgagors, and were payable to Delmer D. Norton, plaintiff, who formerly owned the mortgaged land. The defendant is the Bankers Fire Insurance Company, a corporation claiming to be the *bona fide* holder of the note and mortgage through valid transfers from

plaintiff. The theory of plaintiff is that a trio of conspirators, called "Kline, Ferguson, and McCord," assisted by a fourth conspirator named "Schmutzer," who represented himself to plaintiff as agent for defendant, cheated plaintiff out of his note and mortgage. Plaintiff pleaded, among other things, that the trio falsely stated to him that they had organized the Bankers Trust Company, hereinafter called the "trust company," saying it was a going corporation with authorized capital stock of $1,000,000; that they represented the trust company and had authority to sell its stock; that the trust company owned a building in Lincoln at the southwest corner of Fifteenth and N streets and needed money to apply on the purchase and to complete its title; that for the purpose mentioned it could use plaintiff's note and mortgage the same as money and would accept them at par for trust company stock of the actual value of $140 a share, but of the face value of $100 a share; that plaintiff agreed to purchase 200 shares for $28,000 and in part payment delivered to the trio his unindorsed note and unassigned mortgage; that Ferguson and McCord engaged Schmutzer, who had knowledge of the facts and of the fraudulent purpose of the trio, to negotiate the note and mortgage; that Schmutzer, pursuant to the conspiracy, presented the note and mortgage to Charles Maixner, treasurer and active manager of defendant, who agreed to purchase for the latter the note and mortgage for $8,300 in Liberty bonds, worth less than their face value, and $2,000 in the stock of defendant; that McCord, Ferguson and Schmutzer had no authority to exchange the note and mortgage for anything but money to apply on the trust company building, but after plaintiff indorsed those instruments for that purpose, they were delivered to defendant for the Liberty bonds and the stock; that the trust company had no corporate existence and did not own any building, and plaintiff did not receive any stock issued by the trust company or any of the stock of the Bankers Fire Insurance Company, defendant, or any proceeds of the note and mortgage or anything of value; that defendant,

in exchange for the note and mortgage, with knowledge of the fraud, turned over to Ferguson and McCord Liberty bonds of the face value of $8,300 and stock of defendant in the sum of $2,000; that the representations of the trio were false and plaintiff believed and relied on them; that the note and mortgage were worth their face value; that defendant knowingly participated in the fraud through which plaintiff was cheated. The facts outlined were pleaded in detail. A demurrer to the petition was overruled. Defendant's answer was a general denial.

Upon a trial of the issues the jury rendered a verdict in favor of plaintiff for the full amount of his claim and interest — $15,376.50. From a judgment therefor defendant appealed.

The overruling of the demurrer is challenged as erroneous, but it is fairly shown by the petition that plaintiff was cheated out of his note and mortgage by the four wrongdoers named and that defendant knowingly participated in the fraud.

The principal argument of defendant was directed to the proposition that the evidence was insufficient to sustain the verdict in favor of plaintiff. It was vigorously contended that there was no evidence connecting defendant with the fraud perpetrated by Kline, Ferguson, McCord and Schmutzer. Maixner, who conducted for defendant the negotiations resulting in the transfer and acceptance of plaintiff's paper, testified in effect that he then had no knowledge of the fraud, and that in good faith he purchased and paid for it, and that in his negotiations he dealt alone with the agents of plaintiff who indorsed the paper and intrusted the wrongdoers with it. Testimony by the holder of a note that he purchased it in good faith for value before maturity without knowledge that it was procured from the payee by the fraud of others may be overcome by circumstantial evidence to the contrary. This in effect was the holding on a former appeal; similar proofs being considered sufficient to take the case to the jury. *Norton v. Bankers Fire Ins. Co.*, 115 Neb. 490.

The following facts were established beyond controversy: Plaintiff was originally the owner of the paper. It was worth its face. He never received anything for it. He lost it by means of the fraud pleaded. The representations by which he was deceived into making the transfers were false and he relied on them. Following the fraudulent transactions and the consummation of the swindle Kline left for Florida and Ferguson for Iowa. McCord died within a year.

The fraud of the trio was denounced in argument with equal vehemence by both plaintiff and defendant. Circumstances surrounding the transactions were disclosed by the evidence. Did they show bad faith on the part of defendant? When the trio first got the paper it was not indorsed or assigned. In that form it showed they did not have the title to it and that in attempting to negotiate it they necessarily represented the owner and not themselves. The swindlers who procured the paper and mortgage by false pretenses engaged to make the sale the man named "Schmutzer," a resident of Iowa, who said on the witness-stand that he had been an insurance broker. A purchaser had not yet been found in Lincoln or Omaha. Schmutzer, offering for sale the unindorsed and unassigned note and mortgage of plaintiff, went to Maixner, who, while testifying in this case, volunteered a reference to his service in the penitentiary. At the time the paper was presented to Maixner, he was in the Lincoln office of the Bankers Fire Insurance Company, defendant, acting there as its managing officer. Without inquiring of plaintiff whether Schmutzer or any one else had authority to sell the note for plaintiff or whether plaintiff as owner was willing to exchange it for depreciated Liberty bonds at their face value and stock of the insurance company, Maixner agreed to buy the paper on terms that did not require payment of any money whatever. As conditions of the purchase plaintiff's indorsement of the note and assignment of the mortgage were required in addition to entries bringing the abstract of the mortgaged land down to date. Schmut-

zer did not report to plaintiff but reported to the trio of conspirators the terms offered by Maixner. One of the trio hurried to Colorado and had the abstract brought down to date, returned and afterward plaintiff was induced by the wrongdoers to indorse the note, assign the mortgage and part with his possession. Both papers were promptly delivered to defendant. Plaintiff testified in effect that he never learned the terms of the sale until the facts came out on the trial. While causing a delay of nearly a week and exacting writings and terms from persons who had possession of the paper without authority to transfer it, neither Maixner nor any one else acting for defendant asked plaintiff if he owned it and if so who was authorized to sell it and if the consideration in bonds and stock, without any money, would be satisfactory. The evidence indicates the answer to such inquiries would have been that the sole purpose of the sale was to procure money to apply on the trust company building and that nothing but money would be accepted, plaintiff at the time being in Lincoln, where information was available. The situation was not only sufficient to arouse suspicion but it called for inquiry at the source of knowledge. Schmutzer himself was a witness for defendant and testified that he went to see Maixner, whom he had never before met, and asked if the Bankers Fire Insurance Company did not want to buy a first class mortgage for $10,000. Maixner, knowingly negotiating for "a first class mortgage," presented by a stranger who assumed to represent the owner without any written authority and without power to bind his principal by his own declarations of agency. proceeded to enter into a contract of purchase without putting into the agent's hands anything that could be turned over at its face value to the owner of the mortgage. A thief trying to dispose of stolen property might have taken the course pursued by Schmutzer. In consummation of the purchasing contract Maixner turned over to one or more of the conspirators $8,300 in Liberty bonds below par and corporate stock of the Bankers Fire Insurance Company. defendant, in the sum of

$5,000, upon the sale of which a credit of $2,000 was given. This credit with the $8,300 in bonds aggregated $10,300— the face of the mortgage without interest and $100 in addition. Referring to Ferguson and McCord, Maixner testified:

"They agreed to purchase some stock in the Bankers Fire Insurance Company for mutual benefit, somehow, and that was the result of the transaction."

Maixner testified also that two notes aggregating $5,000 were accepted by defendant for the stock, but that he did not recollect whether they were signed jointly by Ferguson and McCord. He credited on one of the notes "the difference between the amount paid for the mortgage and the face of the mortgage." It thus appears that defendant, knowing he was dealing with Ferguson and McCord in a representative capacity without legal evidence of their agency, entered into a contract to pay to them individually in stock $2,000 in proceeds belonging to plaintiff. After entering into the contract to purchase the note and mortgage Maixner, for the protection of defendant, commissioned Ferguson and McCord to procure from plaintiff a receipt for $10,200, reciting that the payment was in full settlement of the mortgage on the Colorado land, knowing that $2,000 of the stipulated price was payable to them individually. There is a view of the circumstances warranting the inference that defendant participated in the fraud of the conspirators, paying to Ferguson and McCord, personally, a portion of the proceeds of the note and enabling them to defraud plaintiff. In this view of the record defendant was not a purchaser in good faith. The evidence therefor was sufficient to sustain the verdict.

Defendant complains that the trial court in the instructions erred in defining the term "holder in due course" and in otherwise directing the jury in regard to the negotiable instruments law. That law did not apply to the case. The action was one to recover damages for the conversion of a note and a mortgage belonging to plaintiff. The makers and mortgagors were not parties to the action and

there was nothing in the pleadings or proofs to indicate a defense to the note or to the mortgage. Defendant, however, was not prejudiced by the instructions relating to the negotiable instruments law, since the charge as a whole required a verdict against plaintiff, if he failed to prove by a preponderance of the evidence that defendant participated in the fraud.

AFFIRMED.

HOWELL, J., concurring.

My understanding of the principal facts in this case is: That Norton, appellee, owned a note secured by mortgage of the face and actual value of $10,200, plus earned interest at 7 per cent. from its date. Persons denominated in the opinion of Rose, J., as "swindlers" pretended to organize a so-called "trust company" to have $1,000,000 capital stock. One or more of them procured the note from Norton and hawked it about attempting, without success, to sell it, and they got in touch with one Maixner, the representative of appellant, who recognized the value of the note and agreed to buy it. The swindlers ostensibly were acting as agents for Norton. Maixner agreed to take the note, but insisted that it be indorsed by Norton. As between the swindlers and Maixner, the swindlers were selling the note for Norton. However, before paying the swindlers, Maixner required that Norton execute a receipt in which he was to acknowledge he had received $10,200 for the note. Norton understood the note was to be sold for cash, to be used to further the business of the trust company. The receipt did not recite the true consideration paid. Maixner knew that. After the indorsement of the note was procured from Norton and after he signed the receipt for the money to be paid, Maixner gave the swindlers, for the note, bonds of the value of $8,300, and issued directly to, in the name of, one of the swindlers, in payment of the remainder of the purchase price, stock of the Bankers Fire Insurance Company. Maixner then knew that defendant was not paying cash for the note and mortgage, but, instead of making payments to Norton, who was

to sign the receipt for the money, knowingly put a part of the purchase price in the name of one of the swindlers. In that transaction the swindler exceeded his authority as agent and Maixner knew it. He assisted the swindler in swindling Norton and was a party to the conversion of the note in so doing.

The transaction was not governed by the negotiable instruments act, but by the law governing ordinary conversion of personal property. The inevitable deductions to be drawn are that the Bankers Fire Insurance Company aided and abetted the swindlers in the conversion. *Cook v. Monroe,* 45 Neb. 355, lays down this rule:

"Under the usually adopted principle of law that he who intermeddles with personal property which is not his own must see to it that he is protected by the authority of one who is the owner or has authority to act, or that he will be himself liable; and that if he do an unlawful act, even at the command of another acting as principal, and without right, a liability will attach."

That case was cited with approval in *Starr v. Bankers Union of the World,* 81 Neb. 377, 381, where it is said:

"Where several parties unite in an act which constitutes a wrong to another, under circumstances which fairly charge them with intending the consequences which follow, it is a very just and reasonable rule of the law which compels each to assume and bear the responsibility of misconduct of all. 1 Cooley, Torts (3d ed.) 153. Hence, it is held that one who aids and assists in a wrongful taking of chattels is liable for the conversion, though he acted as agent for a third person."

The undisputed evidence charges the Bankers Fire Insurance Company, through Maixner, with knowledge of the wrong that was being done to Norton. In the opinion of Rose, J., it is said:

"Maixner, who conducted for defendant the negotiations resulting in the transfer and acceptance of plaintiff's paper, testified in effect that he then had no knowledge of the fraud, and that in good faith he purchased and paid for it,

and that *in his negotiations he dealt alone with the agents of plaintiff who indorsed the paper and entrusted the wrongdoers with it.* (Italics the writers.) Testimony by the holder of a note that he purchased it in good faith for value before maturity without knowledge that it was procured from the payee by the fraud of others may be overcome by circumstantial evidence to the contrary."

Maixner was dealing with one whom he knew to be the agent of Norton, and was charged with knowledge of the powers ordinarily possessed by an agent authorized to sell his principal's property. Unless otherwise shown, the sale could be made only for cash. The proceeds of such sale belonged to the principal. A sale made on terms beyond the authority of an agent is void (at least voidable) as to the purchaser who took with knowledge of the violation of the duties of the agent. The circumstances surrounding the purchase and the admitted knowledge of Maixner that he was negotiating with persons acting as Norton's agents are sufficient to make the appellant liable in conversion.

It is not necessary to go further back and show that the insurance company had knowledge of any particular fraud which the swindlers had perpetrated upon Norton. The insurance company, through Maixner, aided the swindlers in getting into their names part of the proceeds which should have been paid in cash for the benefit of Norton. That was sufficient knowledge, in law, to compel further investigation by Maixner and the insurance company. There was not a single dollar of money paid for the note by the insurance company. This leads to the conclusion, as one of law, that the insurance company aided in the conversion of the note. It may be said that the trial court erred in giving the instruction defining "holder in due course," and in telling the jury, in effect, that the transaction was controlled by the negotiable instruments act, as to burden of proof. We do not think this instruction was prejudicial error, because there is sufficient in the record to have required of the appellant further and additional explanations as to the part it took. In other words, the

attempted explanations were, in law, no explanations, but rather confirm the belief that Maixner knew that Norton's agents were taking unto themselves property other than money in payment for Norton's note, and that Norton was not going to receive the stock issued to, and in the name of, one of the swindlers. It may be added that the instruction was more favorable to appellant than it was entitled to. The judgment should be affirmed.

GOOD, J., dissenting.

In so far as the opinion holds that defendant is liable for a conversion of the note and mortgage in controversy, I respectfully dissent.

The record shows that while plaintiff was the owner and holder of the note and mortgage he voluntarily surrendered and turned them over to Kline, Ferguson, and McCord, with the understanding and agreement that he was to receive in consideration therefor stock in a trust company which they were then supposed to have organized. Plaintiff testified that he did not expect to receive any part of the consideration that was paid by defendant for the note and mortgage. No doubt exists that Kline, Ferguson, and McCord, through fraud, procured from plaintiff the note and mortgage. Plaintiff knew that they were negotiating for and contemplating a sale thereof and did not protest. When they, through Schmutzer, found a purchaser for the note and mortgage, plaintiff was informed of that fact, and then indorsed the note and assigned the mortgage and placed it in the power of those, to whom he had transferred the note and mortgage, to sell and transfer title to another. They did transfer it to the defendant and received in consideration therefor Liberty bonds to the amount of $8,300 and stock in the Bankers Fire Insurance Company of the face value of $2,000. The total amount paid by defendant for the note and mortgage represented its face value. It is doubtless true that plaintiff did not then realize that he was being victimized by Kline and his associates.

The majority opinion proceeds on the erroneous theory

that Kline, Ferguson, and McCord were agents of the plaintiff and acting for him in the sale of the note and mortgage, and that, being agents, they had authority to sell only for cash. The record does not justify the assumption. Kline and his associates were acting for themselves, or nominally for the mythical trust company. Plaintiff, as he testified, was not to receive any of the proceeds of the sale, because he was to receive stock in the trust company, for which he had subscribed. Had the defendant paid to Kline and his associates the full cash value of the note and mortgage, plaintiff would be in no better position; he would have received no part of the money.

To constitute a conversion there must be a taking of personal property from the owner without his consent. It is a rule, well recognized and almost without exception, that if the owner of personalty expressly or impliedly consents to the taking, use or disposition of his property he cannot recover therefor in an action for conversion. 38 Cyc. 2009. The text announcing this rule cites, in its support, authorities from 17 states, including Nebraska. In *Carlson v. Jordan,* 4 Neb. (Unof.) 359, it is held: "No action for conversion will lie on account of a disposition of property which plaintiff admits authorizing."

In the instant case, plaintiff not only authorized the sale of his note and mortgage to defendant, but participated therein, after he had knowledge that the note and mortgage were being negotiated by Kline and his associates. He indorsed the note and the coupons attached thereto and assigned the mortgage, leaving them in possession of Kline and his associates for delivery.

Justice and equity will not permit plaintiff to recoup from defendant the loss which he sustained through the fraud practiced by Kline, Ferguson, and McCord. To do so would be to compensate plaintiff for a loss sustained through fraud not practiced by defendant. The record clearly shows that the officer of defendant, who acted for it in acquiring the note and mortgage, had no knowledge of Kline, Ferguson, and McCord, or of Schmutzer, until

after plaintiff had subscribed for the stock in the trust company and delivered his note and mortgage to them. There is no direct evidence, nor, as I view the record, are there any facts or circumstances proved, which would justify an inference that any officer of defendant participated in the fraud practiced upon the plaintiff, or had any knowledge thereof, until long after defendant had purchased and paid for the note and mortgage.

In my opinion, the judgment of the district court is not supported by the evidence and should be reversed.

EBERLY, J., concurs in this dissent.